IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SDC FINANCIAL, LLC and SMILEDIRECTCLUB, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. ) |
| MARTIN BREMER, SMILE STORE, LLC, MH, D.M.D. of TENNESSEE, PLLC, and SMILE STORE SUPPORT SERVICES, LLC | ) ) ) ) ) |
| Defendants. | |

## **COMPLAINT**

Plaintiffs SDC Financial, LLC ("SDC Financial") and SmileDirectClub, LLC ("SDC, LLC" and collectively with SDC Financial, "SDC") bring this action against Defendants Martin Bremer ("Bremer"), Smile Store, LLC, MH, D.M.D. of Tennessee, PLLC, and Smile Store Support Services, LLC (together "Smile Store," and collectively with Bremer, "Defendants"). In support of this action, SDC states:

## **Introduction**

1.    This is an action for federal and state trademark infringement, dilution and unfair competition under Tennessee state law, violation of the Tennessee Uniform Trade Secrets Act, violation of the Federal Defend Trade Secrets Act, common law and statutory procurement/inducement of breach of contract, tortious interference with existing and/or prospective business relations, and unjust enrichment.

2. SDC pioneered the direct-to-consumer market for clear aligners used in orthodontics. SDC's business model allows consumers to straighten their teeth at 60 percent to 70 percent below the prices of traditional in-office orthodontic treatments. SDC operates a national chain of SMILESHOP retail stores, which form a core part of its dental support organization ("DSO") business. During a visit to one of SDC's SMILESHOP retail stores, consumers can provide health and dental histories, obtain information about financing and pricing, have free photographs and sophisticated photographic imaging of their teeth and gums performed, learn about clear aligner therapy, and visualize how the aligners can change their own smiles. The affordability and accessibility of clear aligners available through SDC's business model, including the use of the SMILESHOP retail stores, has disrupted traditional orthodontic delivery models.

3. In 2016, recognizing SDC's success, Align Technology, Inc. ("Align") invested in SDC, became a member of SDC, and agreed to be SDC's exclusive outside manufacturer of clear aligners. As a condition to this partnership, Align agreed, among other things, that it would not: (1) misuse or share any of SDC's confidential information or trade secrets; (2) work with any business that competed with SDC; or (3) sell aligners to any other business that distributed aligners through a direct-to-consumer channel.

4. In 2016, at the same time Align made its investment in SDC and agreed to the aforementioned contractual obligations, Martin Bremer, at the time Align's Global Process Owner (Plan-to-Make), played an integral role in adapting Align's manufacturing process to meet SDC's needs. Bremer attended weekly

2

calls with SDC employees, travelled to San Jose to meet the SDC team, and participated in the design and testing of the technical specifications required for Align's manufacturing of SDC's aligners. Tellingly, Bremer also volunteered to visit SDC's headquarters to help integrate its software with Align's programs—a task that admittedly had no relationship to Bremer's responsibilities at Align. Through these interactions, Bremer gained access to SDC's trade secrets and confidential information, and learned the ins and outs and multitude of benefits of running a retail store in connection with the sale of clear aligner therapy.

5.     SDC opened a Nashville, Tennessee SMILESHOP retail store on May 9, 2016. Two years later in 2018, after leaving Align, Bremer opened his own version of the SMILESHOP retail store, under the confusingly similar mark SMILESTORE, in Nashville, Tennessee. Defendants' infringing SMILESTORE retail store receives its aligners from Align and prominently holds itself out as an "Invisalign Provider." Bremer selected the infringing SMILESTORE mark intentionally, and with full knowledge of SDC's prior and superior rights in its own SMILESHOP mark.

6.     Not only is Defendants' SMILESTORE mark highly similar in sight and sound and conceptually identical to SDC's own SMILESHOP mark, the goods and services that Defendants offer through their SMILESTORE retail stores are identical to those offered by SDC's SMILESHOP retail stores. As such, Defendants' adoption of SMILESTORE is likely to cause consumer confusion and constitutes trademark infringement, dilution and unfair competition. In addition, Bremer—who had no experience in the direct-to-consumer clear aligner

3

market prior to his interactions with SDC—misappropriated SDC's trade secrets and confidential information to create and operate his infringing SMILESTORE retail store. Finally, by contracting with and receiving aligners from Align, Bremer and Smile Store have tortiously interfered with SDC and Align's agreements. Bremer not only knew of these agreements, but also built Align's manufacturing system for SDC pursuant to the partnership.

## Jurisdiction and Venue

7.     The Court has personal jurisdiction over Bremer and Smile Store because Bremer is domiciled in Tennessee, and Smile Store's principal place of business is in Nashville, Tennessee. Tenn. Code Ann. § 20-2-222(1); Fed. R. Civ. P. 4(k)(1).

8.     The Court has subject matter jurisdiction over the case pursuant to Section 39 of the Lanham Act (15 U.S.C. § 1121), and 28 U.S.C. §§ 1331 and 1338.

9.     The Court has supplemental jurisdiction over SDC's state law claims pursuant to 28 U.S.C. § 1367(a). SDC's claims are predicated upon the Trademark Act of 1946, as amended, 15 U.S.C. § 1051 *et seq.*, and are substantial and related claims under the statutory and common law of the State of Tennessee.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1). Smile Store resides in Davidson County, and Bremer is a resident of Tennessee. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in Davidson County.

4

**The Parties**

11.    SDC, LLC is a Tennessee limited liability company with its principal place of business in Nashville, Tennessee. SDC, LLC holds the rights to all of SDC's intellectual property, including its trademarks.

12.    SDC Financial also is a Tennessee limited liability company. SDC Financial is the sole member of SDC, LLC.

13.    Upon information and belief, Smile Store, LLC is a company that distributes clear aligners through a physical retail establishment located inside the Mall at Green Hills at 2126 Abbott Martin Road, Suite 168, Nashville, Tennessee. Smile Store describes itself as an "Invisalign Provider." *See* Smile Store Homepage (https://www.smile.store/) (last accessed June 25, 2019), a copy of which is attached here as **Exhibit A.**

14.    Upon information and belief, MH D.M.D. of Tennessee, PLLC is a Tennessee member-managed limited liability company with an active assumed name of "Smile Store." Its principal place of business is located at 2126 Abbott Martin Road, Suite 168, Nashville, Tennessee.

15.    Upon information and belief, Smile Store Support Services, LLC, is a member-managed Delaware limited liability company. Its principal place of business is located at 2126 Abbott Martin Road, Suite 168, Nashville, Tennessee.

16.    Bremer is the President and CEO of Smile Store, based in Nashville, Tennessee. Before creating Smile Store, Bremer worked at Align. Bremer resides in Nashville, Tennessee. In his role as President and CEO of Smile Store, Bremer has directed, overseen and personally participated in each of the complained-of

5

acts outlined in this Complaint. Upon information and belief, Bremer also has a direct financial interest in each of the limited liability defendants.

**SDC's SMILESHOP Trademark & Retail Stores**

17.    SDC provides non-clinical, administrative dental support services, such as marketing and advertising assistance, a call center, assistance with logistics and supply services, billing and collection services, and access to SDC's web-based teledentistry platform (collectively, "DSO Services") to those dental practices who chose to engage SDC for such DSO Services. These DSO Services enable state-licensed doctors to offer a more affordable option for orthodontic treatment of mild to moderate cases of malocclusion with clear aligner therapy.

18.    SDC's DSO Services, including its teledentistry platform, enables state-licensed doctors to remotely provide clear orthodontic aligner therapy to consumers – safely, discreetly, and without the hassle of in-person monthly visits. SDC and the state-licensed doctors who use SDC's DSO Services and teledentistry platform via a suite of agreements, including a license agreement, offers all goods and services under its SMILE DIRECT CLUB house mark, and then brand many of its offerings with one of a family of SMILE-formative secondary marks, including, among others, SMILECHECK, SMILEPAY, and SMILESHOP.

19.    Each SMILESHOP is a comfortable retail location which provides consumers with the ability to learn about clear aligner therapy, complete medical and dental health histories, review and execute an informed consent and receive information regarding pricing and financing. Consumers interested in exploring

6

whether doctors using the SDC DSO Services, including the teledentistry platform, can assist them to straighten their teeth can visit the SDC website and schedule a free appointment at an SDC SMILESHOP location to have their teeth and gums photographically imaged and to have multiple traditional digital photos of their teeth and gums taken. As a part of the DSO services that SDC provides to the doctors who engage SDC, SDC employees, called "SmileGuides," take traditional digital photographs of the consumer's teeth and gums, along with more sophisticated photographs of the consumers teeth and gums using a photographic imaging device, an iTero, which transmits thousands of highly detailed photos turned into a 3D image to a dental lab for the creation of a draft treatment plan to address the consumer's chief complaint.

20.     Once these photos are taken and the consumer completes a medical and dental history and informed consent, SDC uploads this information to SDC's remote SMILECHECK platform. After assessing all information uploaded by SDC and such other information that the treating doctor determines is necessary, the treating doctor decides in his or her professional opinion, whether that consumer is a viable candidate for clear aligner therapy using the SDC teledentistry platform.  If so, the treating doctor reviews and modifies as necessary, the draft treatment plan.  Once approved, a 3D rendering of what the patient's teeth currently look like and how their teeth will move over the course of treatment is uploaded to the patient's account on the SDC website for the patient to log into and view. If the patient is satisfied with their treatment plan and elects to move forward, the patient approves the treatment plan, and the treating doctor

authorizes a prescription order for the clear aligners. SDC then sources the manufacturing of the clear aligners, and then ships the clear aligners directly to the patient's address at the direction of the treating doctor.

21.     Since the first SMILESHOP store opened in October 2016, the SMILESHOP stores have come to, collectively, represent a central component of SDC's business model and have proven very successful for SDC—generating a significant portion of SDC's revenue. SDC currently operates or provides administrative services to more than 240 SMILESHOP retail stores throughout the United States and Canada, including a store in Nashville, Tennessee.

22.     SMILESHOP is an inherently distinctive mark, but through SDC's years of use and extensive advertising and promotion of services offered under the mark, SMILESHOP has also attained a high level of acquired distinctiveness, or secondary meaning.  Consumers have come to recognize and rely on the SMILESHOP mark as indication of quality and to identify SDC, exclusively, as the source of services offered under that mark.  In order to protect its rights in its SMILESHOP mark, SDC has filed two federal service mark applications, as follows:

| **Mark** | **App. Ser. No.** | **Allowance Date** | **First Use** | **Services** |
|----------|-------------------|--------------------|----------------|--------------|
| SMILESHOP | 87/944,567 | 5/28/19 | 10/13/16 | Retail store services featuring dental impression kits, orthodontic and dental supplies and access to licensed dental professionals (Class 35) |
| SMILESHOP | 87/942,796 | 6/4/19 | 10/13/16 | 3D scanning services using oral apparatus for dimensional measurement; Digital imaging services using computer software to generate an electronic image of a user's projected results from |

8

clear-aligner treatment; Providing information in the field of clear-aligner treatment; Consultation services regarding treatment plans for addressing irregularities of the teeth and jaws using clear aligners; evaluation and assessment services to determine a candidate's eligibility for successful clear-aligner treatment (Class 44)

Both SMILESHOP applications have been "allowed" by the United States Patent and Trademark Office, and are expected to proceed to full registration shortly.

## SDC's Confidential Information & Trade Secrets

23.     SDC's owners and management have a long history of being successful pioneers in direct-to-consumer ventures in a wide variety of industries, including Quicken Loans and 1-800-Contacts. SDC relied on this extensive experience, as well as spending a substantial amount of time, money and effort, in developing and establishing a successful network of SMILESHOP retail stores across North America. These extensive efforts resulted in SDC's confidential information and trade secrets regarding direct-to-consumer ("DTC") marketing. This confidential information and trade secrets includes business plans, marketing and promotional strategies, consumer and market information, performance information around SMILESHOP show rates and conversion, operation and workflow at SMILESHOP retail stores, pricing information, financing options and strategies, and competitive business information.

24.     SDC's confidential information and trade secrets are not generally known to the public, and SDC obtains an economic benefit because the

9

information is not publicly known. SDC took reasonable efforts to maintain the secrecy of its confidential information and trade secrets.

### The SDC-Align Relationship

25.     On July 25, 2016, Align purchased a 17 percent interest in SDC and became a Member of SDC, LLC. As a new member, Align signed an Operating Agreement with SDC, LLC. On the same day, Align signed a Strategic Supply Agreement and became the exclusive third-party supplier of aligners to SDC, LLC. Under the Supply Agreement, Align agreed not to provide aligners to any other company distributing aligners through a direct-to-consumer model.

26.     On January 31, 2018, as part of a refinancing, SDC formed a new limited liability company, SDC Financial, and transferred all Membership interests in SDC, LLC to SDC Financial. Align entered into the SDC Financial Operating Agreement and became a Member of SDC Financial. The relevant terms of the SDC Financial Operating Agreement are identical to the SDC, LLC Operating Agreement (together, the "Operating Agreements").

27.     Align accepted and agreed to the terms and conditions of the Operating Agreements as a Member of SDC. Section 7.9 of the Operating Agreements is entitled "Restrictive Covenants." It provides, in pertinent part, each Member:

> ... agrees that, so long as such Member remains a Member of the Company and for a period of two years immediately following the date on which such Member ceases to be a Member, **such Member**, and such Member's owners, officers and agents (collectively, the "Member Affiliates") **shall not, directly or indirectly**:

Case 3:19-cv-00525   Document 1   Filed 06/25/19   Page 10 of 28 PageID #: 10

(e) **Engage in (whether as an owner, proprietor, general or limited partner, member, principal, officer, employee, consultant, director, investor, agent or otherwise), or be employed or contracted by, any Competing Business in the Restricted Territory** (whether or not compensated for such services);

*****

A **"Competing Business"** means: (i) any person or business directly or indirectly engaged in owning, operating, developing, managing or providing administrative, management, marketing or other business services for the remote provision of tooth alignment apparatus or similar businesses pursuant to which the alignment apparatus is delivered by means of a common carrier delivered directly to the customer wearing the apparatus, (ii) **any provider of services identical or substantially similar to the services provided by the Company and its Affiliates or in which the Company and its Affiliates engage,** and (iii) any business or business opportunity that the Member knows the Company or its Subsidiaries, Affiliates or Associated PCs to be pursuing or considering at the time of the termination of the Member's direct or indirect ownership of Units. ... The "Restricted Territory" shall mean the entirety of any state in which the Company does or intends to conduct Company Business.

Operating Agreements, at § 7.9(e) (underlining in original) (bolding added). SDC does business in the United States and Canada, and the "Restricted Territory" encompasses Davidson County, Tennessee.

### Bremer's History with SDC and Align

28.     When Align agreed to manufacture aligners for SDC, it did not have software or a manufacturing process that catered to direct-to-consumer retail stores like the SMILESHOP retail stores. Indeed, Align had no experience in retail

11

at all. As a result, SDC worked with Align to adapt Align's software and manufacturing to fit SDC's business model.

29.    Bremer, who served as Align's Global Process Owner (Plan-to-Make) at the time, worked closely with SDC to develop the manufacturing process that Align used to fulfill aligner orders for the state-licensed doctors who use the SDC DSO Services and teledentistry platform. In this role, Bremer attended weekly calls with SDC employees, travelled to San Jose to meet the SDC team, and participated in the design and testing of the technical specifications required for Align's manufacturing of aligners prescribed by the doctors using SDC's DSO Services and teledentistry platform. Bremer, as a result, learned SDC's process— from the moment a consumer makes an appointment at a SMILESHOP retail store, through submission of an order, to the delivery of the aligners.

30.    Bremer also gained valuable information about SDC's business practices outside of his role in manufacturing. In September 2016, for example, Bremer volunteered to visit SDC's offices in Nashville, Tennessee, to help facilitate local execution of Align's software platform. To prepare for his visit, Bremer spent time learning about the SDC/Align software portal. At the time, Bremer did not have any experience with Align's software platform, and the software was outside the scope of his manufacturing position at Align.

31.    During this time, Bremer built a relationship with SDC and many of its employees. In December 2016, Bremer inquired about the COO position at SDC, and asked for information about any other job openings at the company. SDC did not advance his application.

12

32.    In May 2017, Align asked Bremer to relocate to San Jose or move on from the company. Bremer left Align to start his own business in Nashville, Tennessee, a business clearly modeled to be a carbon copy of SDC's SMILESHOP stores.

**Defendants' Infringing SMILESTORE Mark**

33.    Defendants opened their competing "SmileStore" location in May 2018. Operating under the SMILESTORE mark, Defendants' retail store is located at the Mall at Green Hills in Nashville, Tennessee. Defendants' hold their location out as an "Invisalign Provider" on their website and prominently display "Invisalign" in their retail signage and on all marketing materials:



34.     Per their website, Defendants plan to open more SMILESTORE locations in 2019. *See* "Locations," Smile Store (https://www.smile.store/locations.html) (last accessed June 25, 2019), a copy of which is attached here as **Exhibit B**.

35.     A consumer interested in Defendants' goods and services begins her journey by making an appointment on Defendants' website, available at URL https://www.smile.store. *See* "How it Works," Smile Store (https://www.smile.store/how-it-works.html) (last accessed June 25, 2019), a copy of which is attached here at **Exhibit C**. At the SMILESTORE appointment, the consumer receives a free imaging of her teeth using the iTero, just like she would at a SMILESHOP location. After the consumer receives her free teeth imaging using the iTero, Smile Store—just like SDC—shows her a simulation of her smile at the end of treatment, and provides her with payment and financing information. If the consumer decides to pursue treatment, Smile Store ships her aligners to the SMILESTORE location, and the consumer makes another appointment to pick them up.

36.     These services are identical to the services SDC provides in its own SMILESHOP retail stores, and Smile Store is a "Competing Business" under the terms of the Operating Agreements. Smile Store also operates on a direct-to-consumer or "DTC" model, as defined in the Supply Agreement.

**SDC's Cease and Desist Letters to Bremer and Smile Store**

37.     When SDC first learned about Defendants' intended use of the nearly identical phrase "SmileStore" in May 2018, it sent Bremer a letter

14

reminding him of SDC's trademark rights. A true and accurate copy of the letter is attached here as **Exhibit D**. The letter explained that the phrase "smile store" "is quite similar in sight, sound and meaning" to the SMILESHOP trademark, "and therefore could, if used as a trademark or service mark . . . cause customer confusion." Exhibit D, at 1. SDC advised Bremer to take "whatever steps necessary to ensure that all of [Smile Store's] brand identities are easily distinguishable from [SDC's] own trademarks and trade dress." *Id.* at 2.

38.     Not only did Bremer not respond to SDC's letter, he doubled down on his use of "smile store"—adopting the infringing mark SMILESTORE for all branding of his own retail stores, with full knowledge of SDC's prior rights. He has made no effort to differentiate his company name or his brand from SDC's SMILESHOP mark. Instead, he has, as best as SDC can tell, done everything possible to *simulate* SDC's process and mislead consumers into believing Defendants' services originate with, or are somehow connected to, SDC.

39.     On May 13, 2019, SDC sent a second letter, serving as notice of breach and including a demand to cease and desist ("May 13 Letter").

40.     The May 13 letter explained how Bremer and Smile Store violated SDC's rights by (1) infringing on SDC's "SMILESHOP" trademark with the confusingly similar term "SMILESTORE;" (2) misappropriating SDC's trade secrets and confidential information to create and operate Smile Store; and (3) tortiously interfering with SDC and Align's Operating Agreements and Supply Agreement, which prohibit Align from contracting with a Competing Business or

selling aligners to a third party that sells aligners through a DTC model, respectively. Neither Bremer nor Smile Store responded to the May 13 Letter.

41.     Bremer and Smile Store's egregious and ongoing violations of SDC's rights have caused, and will continue to cause, irreparable harm to SDC, including loss of customers, loss of goodwill, loss of market share, and other harm. These harms are not fully compensable by monetary damages.

## Count I

### Federal Trademark Infringement (15 U.S.C. § 1125(a)) (SDC, LLC v. Bremer and Smile Store)

42.     SDC re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 41.

43.     SDC holds a valid and enforceable trademark on the mark SMILESHOP. SDC has used that mark in commerce since long prior to Defendants' adoption of SMILESTORE, and continues to use SMILESHOP in commerce today.

44.     SMILESHOP is an inherently distinctive mark that also has considerable acquired distinctiveness. Consumers associate the mark exclusively with SDC for use in connection with clear aligner treatment and related goods and services.

45.     Defendants' adoption and use of the mark SMILESTORE as described above is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with SDC.

16

46.    Defendants' adoption and use of the mark SMILESTORE as described above is likely to cause confusion, or to cause mistake, or to deceive as to whether the goods and services offered by Defendants are sponsored, certified or approved by SDC.

47.    Defendants' intentional acts constitute willful and intentional trademark infringement under the Lanham Trademark Act, 15 U.S.C. § 1125(a).

48.    Defendant Bremer directly participated in or supervised the acts constituting trademark infringement.

49.    Defendants' acts of infringement have damaged and will continue to damage SDC, and SDC has no adequate remedy at law.

50.    Because Defendants' acts of infringement are intentional and willful, this is an exceptional case, entitling SDC to reasonable attorney fees pursuant to 15 U.S.C. § 1117(a), as well as other monetary, equitable and injunctive relief.

### Count II

### Common Law Trademark Infringement
**(SDC, LLC v. Bremer and Smile Store)**

51.    SDC re-alleges and incorporates by reference all of the allegations contained in paragraphs 1 through 50.

52.    SMILESHOP is a valid and legally protectable mark owned exclusively by SDC, LLC.

53.    Ordinary Tennessee purchasers, buying with ordinary caution, are likely to be misled by Defendants' infringing use of SMILESTORE.  Defendants' infringing use of SMILESTORE creates a likelihood of confusion among

consumers, who may mistakenly believe that Defendants' store is associated with SDC or its SMILESHOP retail stores, that SDC approved the use of SMILESTORE or the store itself, and/or that the goods sold in the SMILESTORE location are sponsored, certified, or approved by SDC.

54. Defendants' intentional acts constitute willful and intentional trademark infringement under the common law of the State of Tennessee.

55. Defendants' acts of infringement have damaged and will continue to damage SDC, and SDC has no adequate remedy at law.

**Count III**

**<u>State Trademark Dilution (Tenn. Code Ann. § 47-25-513)</u>**
**(SDC, LLC v. Bremer and Smile Store)**

56. SDC re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 55.

57. By virtue of SDC's founding and headquarters location in Nashville and years of successful operation of a SMILESHOP location in Nashville, as well as SDC's extensive advertising and promotion efforts, the SMILESHOP mark is highly distinctive and famous in the State of Tennessee.

58. Defendants use the highly similar mark SMILESTORE in Tennessee commerce, in connection with the offering of identical goods and services to those offered by SDC under its SMILESHOP mark. Defendants use the SMILESTORE mark to compete for the same customers and potential customers targeted by SDC—consumers interested in clear-aligner therapy. The parties' two competing retail stores share the identical geographic limitations, in that they are both located in Nashville, Tennessee.

18

59. Such use by Defendants of SMILESTORE began after the SMILESHOP mark had already become famous, and causes dilution of the distinctive quality of the SMILESHOP mark.

60. Defendants' intentional acts constitute willful and intentional trademark dilution under the Tennessee Trademark Act of 2000, T.C.A. § 47-25-513.

61. Defendants' acts of dilution have damaged and will continue to damage SDC, and SDC has no adequate remedy at law.

**Count IV**

**State Unfair Competition (Tenn. Code Ann. § 47-18-101 *et seq.*)**
**(SDC, LLC v. Bremer and Smile Store)**

62. SDC re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 61.

63. Defendants' intentional acts have caused and will continue to cause a likelihood of confusion or misunderstanding about the source, sponsorship and/or approval of Defendants' goods and services.

64. Defendants' intentional acts have caused and will continue to cause a likelihood of confusion or misunderstanding about Defendants' affiliation, connection or association with SDC.

65. Defendants' intentional acts have caused harm to the business reputation and goodwill of SDC, SDC's business relations with customers and prospective customers, and to consumers. By virtue of their wrongful acts, Defendants have realized substantial profits and gains to which they are not entitled.

19

66.    Defendants' intentional acts constitute unfair and/or deceptive acts and practices, in violation of the Tennessee Consumer Protection Act, T.C.A. § 47-18-101 *et seq.*

67.    Defendants' acts have damaged and will continue to damage SDC, and SDC has no adequate remedy at law.

## Count V

### Trade Secret Misappropriation Under the
### Tennessee Uniform Trade Secrets Act
**(SDC, LLC, and SDC Financial v. Bremer and Smile Store)**

68.    SDC re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 67.

69.    SDC's successful strategies and business development plans for its SMILESHOP retail stores, including information about what has and has not worked for SDC in its development of the SMILESHOP retail stores, as well as how SDC plans, markets, and operates each location, constitute trade secrets within the definition contained in the Trade Secrets Act.

70.    Bremer acquired SDC's confidential information and trade secrets while employed at Align, and knew or should have known that he had a duty to keep all of SDC's trade secrets and confidential information secret. In addition, Bremer may have acquired SDC's trade secrets and confidential information through Align itself, which had a duty to keep SDC's trade secrets and confidential information confidential both under the Operating Agreement and through its fiduciary duties as a member of SDC.

20

71.     Defendants misappropriated SDC's confidential information and trade secrets by, among other things, using the confidential information and trade secrets to launch Smile Store and open its SMILESTORE retail shop, which directly competes against SMILESHOP stores, and by planning to open additional SMILESTORE locations to compete against SDC's SMILESHOP retail stores.

72.     Defendants' acts have damaged and will continue to damage SDC.

73.     The Court therefore should therefore issue a permanent injunction prohibiting Bremer and Smile Store from misappropriating SDC's confidential information and trade secrets, and order the immediate closing of the SMILESTORE location, which Bremer created by misappropriating SDC's confidential information and trade secrets.

**Count VI**

**Trade Secret Misappropriation Under the
Federal Defend Trade Secrets Act**
**(SDC, LLC, and SDC Financial v. Bremer and Smile Store)**

74.     SDC re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 73.

75.     SDC's successful strategies and business development plans for its SMILESHOP retail stores, including information about what has and has not worked for SDC in its development of the SMILESHOP retail stores, as well as how SDC plans, markets, and operates each location, constitute confidential information and trade secrets within the definition contained in the Federal Defend Trade Secrets Act.

21

76.     Bremer acquired SDC's confidential information and trade secrets while employed at Align, and knew or should have known that he had a duty to keep all of SDC's confidential information secret. In addition, Bremer may have acquired SDC's confidential information and trade secrets through Align itself, which had a duty to keep SDC's confidential information and trade secrets confidential both under the Operating Agreement and through its fiduciary duties as a member of SDC.

77.     Defendants misappropriated SDC's confidential information and trade secrets by, among other things, using the confidential information and trade secrets to open SMILESTORE, which directly competes against SMILESHOP stores, and by planning to open additional SMILESTORE locations to compete against SDC's SMILESHOP retail stores.

78.     Defendants' acts have damaged and will continue to damage SDC.

79.     The Court therefore should therefore issue a permanent injunction prohibiting Bremer and Smile Store from misappropriating SDC's confidential information and trade secrets, and order the immediate closing of the SMILESTORE location, which Bremer created by misappropriating SDC's confidential information and trade secrets.

**Count VII**

**Common Law and Statutory Procurement/Inducement of Breach of Contract– Operating Agreements**
**(SDC, LLC, and SDC Financial v. Bremer and Smile Store)**

80.     SDC re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 79.

22

81. The Operating Agreements between SDC and Align are valid and enforceable contracts.

82. Defendants knew of these contracts. Among other things, Bremer led Align's efforts to restructure its manufacturing process to meet SDC's needs under the Operating Agreements. In the May 13 letter, SDC reminded Defendants of these contracts, and explained that Align, by engaging or contracting with the Smile Store, had breached these agreements.

83. Defendants, with malice, intentionally induced and/or procured Align to breach the Operating Agreements, as evidenced by Smile Store's continued cooperation with Align for aligners, and Smile Store's branding as an "Invisalign Provider."

84. Align has breached the Operating Agreements by contracting with Smile Store, a Competing Business within the Restricted Territory.

85. Defendants proximately caused these breaches by continuing to operate the SMILESTORE retail store as an "Invisalign Provider" and by selling Align's clear aligners.

86. By benefiting Align at SDC's expense, Defendants' interference with the Operating Agreements is malicious.

87. Pursuant to Tenn. Code Ann. § 47-50-109 and common law, Defendants' actions constitute procurement and inducement of breach of contract.

88. SDC has suffered damages because of Smile Store, which operates a SMILESTORE shop in the same city as one of SDC's own SMILESHOP retail

23

stores and where SDC is headquartered. If, as its website indicates, Smile Store plans to expand to other locations, SDC's injuries will increase.

89.     The Court should enjoin Bremer and Smile Store from engaging or contracting with Align as an owner, proprietor, general or limited partner, member, principal, officer, employee, consultant, director, investor, agent or otherwise of the Smile Store or any other direct-to-consumer retail store.

### Count VIII
### Common Law and Statutory Procurement/Inducement of Breach of Contract – Supply Agreement
### (SDC, LLC v. Bremer and Smile Store)

90.     SDC re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 89.

91.     The Supply Agreement between SDC, LLC and Align is a valid and enforceable contract.

92.     Defendants knew of this contract. Among other things, Bremer led Align's efforts to restructure its manufacturing process to meet SDC's needs under the Supply Agreement. In the May 13 letter, SDC reminded Defendants of this contract, and explained that Align, by engaging or contracting with the Smile Store, had breached this agreement.

93.     Defendants, with malice, intentionally induced and/or procured Align to breach the Supply Agreement, as evidenced by Smile Store's continued cooperation with Align for aligners, and Smile Store's branding as an "Invisalign Provider."

24

94.     Align has breached the Supply Agreement by providing aligners to a third party—Smile Store—that operates on a direct-to-consumer or "DTC" model.

95.     Defendants proximately caused this breach by continuing to operate the SMILESTORE retail store as an "Invisalign Provider" and by selling Align's clear aligners.

96.     By benefiting Align at SDC's expense, Defendants' interference with the Supply Agreement is malicious.

97.     Pursuant to Tenn. Code Ann. § 47-50-109 and common law, Defendants' actions constitute procurement and inducement of breach of contract.

98.     SDC has suffered damages because of Smile Store, which operates in the same city as one of SDC's own SMILESHOP stores and where SDC is headquartered. If, as its website indicates, Smile Store plans to expand to other locations, SDC's injuries will increase.

99.     The Court should enjoin Bremer and Smile Store from contracting with Align to supply clear aligners to Smile Store, or otherwise working with Align to sell clear aligners through a direct-to-consumer model.

**Count IX**
**Intentional Interference with Existing and/or Prospective Business Relationships**
**(SDC, LLC, and SDC Financial v. Bremer and Smile Store)**

100.    SDC re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 99.

101.  SDC had or has existing and/or prospective business relationships with various businesses, including but not limited to Align.

102.  Defendants were and are aware of the existing and/or prospective business relationships between SDC and Align.

103.  Defendants intentionally and without justification and by improper motive or improper means interfered with SDC's existing and/or prospective business relationships with Align.

104.  SDC has been, and will be, harmed by Defendants' interference with SDC's existing and/or prospective business relationships with Align.

105.  Defendants' actions constitute tortious interference with existing and/or prospective business relationships.

106.  As a result of Defendants' intentional conduct, SDC has suffered actual damages.

### COUNT X

### Unjust Enrichment
### (SDC v. Bremer and Smile Store)

107.  SDC re-alleges and incorporates by reference all of the allegations contained in Paragraphs 1 through 106.

108.  While working with SDC during his tenure at Align, Bremer received the benefit of learning the inner workings of SDC's business—including its workflows—through observation and regular communication with SDC employees.

109.  Bremer knew the value of this information. Bremer, in fact, sought out opportunities to learn more about SDC's business, even when these opportunities had no relationship to his responsibilities at Align.

110.  Defendants accepted the benefit of this information by using it as a blueprint to create Smile Store and operate Smile Store's website and the SMILESTORE retail store.

111.  SDC has spent a considerable amount of time, energy, and money to create the SMILESHOP retail stores and the workflow for the SMILESHOP stores, and it is inequitable for Bremer to retain the benefit of this information without compensating SDC.

112.  The Court should award SDC damages based on Bremer and Smile Store's unjust enrichment using SDC's information.

**WHEREFORE**, SDC respectfully requests the Court enter judgment in SDC's favor and against Martin Bremer and Smile Store as follows:

a.  Permanently enjoining Bremer and Smile Store from using the SMILESTORE mark, the term "smile store" or any other name, mark or term that is confusingly similar to SDC's SMILESHOP mark;

b.  Permanently enjoining Bremer and Smile Store from using SDC's confidential information and trade secrets, and ordering the immediate closing of the SMILESTORE retail store, which Bremer created by misappropriating SDC's confidential information and trade secrets;

c.  Permanently enjoining Bremer and Smile Store from engaging or contracting with Align as an owner, proprietor, general or limited partner, member, principal, officer, employee, consultant, director, investor, agent or otherwise of Smile Store or any other direct-to-consumer retail store;

27

d.      Permanently enjoining Bremer and Smile Store from contracting with Align to supply clear aligners to Smile Store, or otherwise working with Align to sell clear aligners through a direct-to-consumer model;

e.      Permanently enjoining Bremer and Smile Store from opening any new SMILESTORE locations or direct-to-consumer, clear aligner retail shops;

f.      Awarding damages to SDC arising from the actions of Bremer and Smile Store;

g.      Awarding punitive and/or treble damages to SDC along with all attorneys' fees and costs incurred by SDC in connection with this action; and

h.      Granting SDC such additional or other relief as the court deems proper.


Dated: June 25, 2019                           Respectfully Submitted,


                                               s/ George H. Cate, III
                                               George H. Cate, III (BPR No. 012595)
                                               R. Brandon Bundren (BPR No. 030985)
                                               **Bradley Arant Boult Cummings LLP**
                                               1600 Division Street, Suite 700
                                               Nashville, TN 37203
                                               Tel: (615) 244-2582
                                               Fax: (615) 252-6347
                                               gcate@bradley.com
                                               bbundren@bradley.com

                                               *Attorneys for SDC Financial, LLC and SmileDirectClub, LLC*

28