# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **SDC FINANCIAL, LLC and** | ) | |
| **SMILEDIRECTCLUB, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00525** |
| | ) | **Judge Aleta A. Trauger** |
| **MARTIN BREMER, SMILESTORE,** | ) | |
| **LLC, SMILESTORE SUPPORT** | ) | |
| **SERVICES, LLC, and MH, D.M.D. OF** | ) | |
| **TENNESSEE, PLLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Before the court is the defendants' Motion to Dismiss Counts III and V–X of Plaintiff's Complaint (Doc. No. 22), under Rule 12(b)(6) or 12(b)(7) of the Federal Rules of Civil Procedure. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.     PROCEDURAL BACKGROUND AND FACTUAL ALLEGATIONS

In a ten-count Complaint, plaintiffs SDC Financial, LLC ("SDC Financial") and SmileDirectClub, LLC ("SDC, LLC") (collectively, "SDC" or the "plaintiffs") bring suit against defendants Martin Bremer; SmileStore, LLC; MH, D.M.D. of Tennessee, PLLC; and SmileStore Support Services, LLC, for trademark infringement under federal and state law, violation of the Tennessee Uniform Trade Secrets Act and the Federal Defend Trade Secrets Act, common law and statutory inducement of breach of contract, tortious interference with existing and/or prospective business relations, and unjust enrichment.

Generally, the plaintiffs allege that they sell clear orthodontic aligners in the direct-to-

consumer market. (Compl., Doc. No. 1 ¶ 2.) They operate a national chain of SMILESHOP retail stores that use the direct-to-consumer model and, in May 2016, opened a direct-to-consumer SMILESHOP retail store in Nashville, Tennessee. (*Id.* ¶ 5).

In July 2016, non-party Align Technology, Inc. ("Align") became a member of plaintiff SDC, LLC and became its exclusive third-party supplier of orthodontic aligners. (*Id.* ¶ 25.) As a new member, Align signed an Operating Agreement with SDC, LLC. It also signed a Supply Agreement in which it agreed not to provide aligners to any other company distributing aligners through a direct-to-consumer model. (*Id.* ¶ 25.) In January 2018, as part of a refinancing, SDC, LLC formed a new limited liability company, SDC Financial. Align thereafter became a member of, and entered into an Operating Agreement with, SDC Financial. (*Id.* ¶ 26.) Both Operating Agreements contain certain restrictive covenants. Among other things, they prohibit Align from engaging in business with a "Competing Business" for as long as it remains a member and for two years following the date on which it ceases to be a member of the operative company. The Operating Agreements define "Competing Business," in relevant part, as "any provider of services identical or substantially similar to the services provided by the Company and its Affiliates or in which the Company and its Affiliates engage." (*Id.* ¶ 27.)

At the time Align became a member of SDC, LLC, defendant Bremer worked for Align as its "Global Process Owner (Plan-to-Make)."[1] (*Id.* ¶¶ 4, 29). As part of his employment with Align, Bremer worked with the plaintiffs to develop the manufacturing process that Align used to fulfill the plaintiffs' aligner orders. (*Id.*). In May 2017, after Align asked him to relocate to San Jose, Bremer left his employment and, along with the other defendants, started a business in Nashville, Tennessee which, according to the plaintiffs, is "clearly modeled to be a carbon copy

---

[1] The plaintiffs do not define this title or otherwise clarify Bremer's role with Align.

of [the plaintiffs'] SMILESHOP stores." (*Id.* ¶ 32.) The defendants opened their competing "SmileStore" location in the Mall at Green Hills, holding out their location to be an "Invisalign" provider. (*Id.* ¶ 33.) The defendants intend to open additional stores in other locations. (*Id.* ¶ 34.)

The plaintiffs allege that the defendants' store offers identical services to those provided in the plaintiffs' SMILESHOP retail stores. They claim that the defendants' SmileStore is a "Competing Business," as that term is defined by the Operating Agreements with Align, and that the defendants' store operates on a "direct-to-consumer" model, as that term is defined by their Supply Agreement with Align. (*Id.* ¶ 36.)

The plaintiffs filed suit on June 25, 2019. In lieu of an answer, the defendants filed their Motion to Dismiss. In it, they argue that (1) Count III, for trademark dilution in violation of Tenn. Code Ann. § 47-25-513, should be dismissed because the plaintiffs have failed to sufficiently allege that their mark is famous; (2) Counts V and VI, for trade secret misappropriation under federal and state law, are subject to dismissal because a person's remembered information and relationships are not protected information; and (3) Counts VII and VIII (inducement of breach of contract), Count IX (intentional interference with existing or prospective business relationships), and Count X (unjust enrichment) are preempted by the Tennessee Uniform Trade Secret Act or otherwise fail to state a claim for which relief may be granted. Alternatively, the defendants argue that the plaintiffs' "non-trademark infringement claims" are subject to dismissal under Rule 12(b)(7) based on the plaintiffs' failure to join an indispensable party, Align. (Doc. No. 23, at 4.)

The plaintiffs oppose the motion. (Response, Doc. No. 24.) The defendants filed a Reply brief (Doc. No. 27), and, with the court's permission, the plaintiffs filed a Sur-reply (Doc. No. 32), as well as sealed copies of the Operating Agreements and Supply Agreement with Align.

## II. DISCUSSION

### A. Failure to State a Claim for Which Relief May Be Granted

#### 1. <u>Rule 12(b)(6)Standard of Review</u>

For purposes of a motion to dismiss under Rule 12(b)(6), the court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.* at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

The *Iqbal* Court suggested that a district court considering a motion to dismiss "can choose to begin" its analysis "by identifying pleadings that . . . are not entitled to the assumption of truth." *Id.* at 679. As indicated above, pleadings that do not constitute factual allegations, including "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations, need not be accepted as true. *Id.* at 681. The question is whether the remaining *factual* allegations plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet

the standard of Fed. R. Civ. P. 8 and must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d).

      2.    <u>Count III</u>

Count III of the Complaint is for trademark dilution in violation of Tenn. Code Ann. § 47-25-513. This statute creates a cause of action by the owner of a mark that is "famous in this state," against another's "commercial use of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." *Id.* § 47-25-513(a). The defendants argue that the Complaint does not sufficiently allege that the plaintiffs' SMILESHOP mark is famous and therefore fails to state a colorable claim for trademark dilution, for purposes of Rule 12(b)(6).

The statute provides a non-exhaustive list of factors the courts "may consider" in making the determination of whether a mark is famous, including the "degree of inherent or acquired distinctiveness of the mark in this state"; the "duration and extent of advertising and publicity of the mark in this state"; and the "recognition of the mark in the trading areas and channels of trade in this state." Tenn. Code. Ann. § 47-25-513(a). The Tennessee state courts have not analyzed this provision, but the federal courts "interchangeably analyze[] the Tennessee and federal antidilution statutes." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 802 (6th Cir. 2004) (citation omitted).

Analyzing a dilution claim under the Federal Trademark Dilution Act ("FTDA") in the context of a motion for summary judgment, this court has previously observed that "[t]he degree of famousness required to make out [a dilution] claim is high, because the Dilution Act was meant to afford expansive trademark protections to a 'far narrower' class of entities than those

subject to traditional trademark protections." *Moore v. Weinstein Co.*, No. 3:09-cv-00166, 2012 WL 1884758, at *41 (M.D. Tenn. May 23, 2012) (citation omitted), *aff'd*, 545 F. App'x 405 (6th Cir. 2013). "[T]o qualify as 'famous,' a mark must be 'widely recognized by the general consuming public'" in the state of Tennessee "as a designation indicating a sole source of goods or services of the mark's owner." *See id.* at *43 (quoting 15 U.S.C. § 1125(c)(2)); *see also Moore v. Weinstein Co.*, 545 F. App'x 405, 411 (6th Cir. 2013) (recognizing that "the scope of the famousness inquiry under state law requires courts to evaluate in-state famousness" of the mark).

The question here is not whether the plaintiff can prevail on its trademark dilution claim but simply whether it has stated a claim under the standard established by *Iqbal* and *Twombly*. The plaintiffs assert that they have done so, but they also request that, if the court decides more is required, they be permitted to replead this count to include additional allegations of fact. (Doc. No. 24, at 6.)

The allegations in the Complaint pertaining to fame are sparse. The plaintiffs allege that they "opened a Nashville, Tennessee SMILESHOP retail store on May 9, 2016" and that the defendants opened their own version of a SMILESHOP retail store, also in Nashville, two years later, "under the confusingly similar mark SMILESTORE." (Doc. No. 1 ¶ 5.) The plaintiffs further allege that they "currently operate[] or provide[] administrative services to more than 240 SMILESHOP retail stores throughout the United States and Canada, including a store in Nashville, Tennessee." (*Id.* ¶ 21.) The plaintiffs do not indicate if they have more than one store in Tennessee. They claim that "SMILESHOP is an inherently distinctive mark" and that SDC has engaged in "years of use and extensive advertising and promotion of services offered under the mark, SMILESHOP," as a result of which the mark has also attained a high level of acquired

distinctiveness, or secondary meaning." (*Id.* ¶ 22.) They do not allege any facts concerning how much advertising is directed to Tennesseans. The fact sections of the Complaint contain no additional allegations relevant to dilution or fame, but, under "Count III," the plaintiffs state that,

> [b]y virtue of SDC's founding and headquarters location in Nashville and years of successful operation of a SMILESHOP location in Nashville, as well as SDC's extensive advertising and promotion efforts, the SMILESHOP mark is highly distinctive and famous in the State of Tennessee.

(*Id.* ¶ 57.)

While inherent and acquired distinctiveness are necessary elements of a trademark dilution claim and form part of the "fame" analysis, they are not co-extensive with fame. *See, e.g.*, *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) ("If dilution protection were accorded to trademarks based only on a showing of inherent or acquired distinctiveness, we would upset the balance in favor of over-protecting trademarks, at the expense of potential non-infringing uses."); *id.* at 876 ("[The federal and state dilution statutes] apply 'only to those marks which are both truly distinctive *and* famous, and therefore most likely to be adversely affected by dilution.'" (quoting S. Rep. No. 100-515, at 42) (emphasis added by Ninth Circuit)).

Under *Iqbal*, the plaintiff's assertion that the SMILESHOP mark is famous in this state is simply a "threadbare recital" of an element of the cause of action. It is not a factual allegation of the type the court must accept as true. As a result, the court is left only with the allegations that SDC has successfully operated a store in Nashville for three years and engaged in extensive advertising and promotion efforts, the audience for which is not disclosed. These allegations, even if true, are simply not sufficient to establish that the mark is "famous" under the very high standard contemplated by both the state and federal statutes.

The court will, therefore, dismiss the claim, but without prejudice to the plaintiffs' ability to amend their pleading to reassert a dilution claim, supported by additional facts.

3.     Count V

Count V is a claim for trade secret misappropriation under the Tennessee Uniform Trade Secrets Act ("TUTSA"). The defendants argue that the claim must be dismissed for failure to state a claim, because the plaintiffs fail to allege the existence of protectible trade secrets.

The TUTSA defines trade secret as:

> [I]nformation, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily accessible by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). Several factors are relevant to determining whether information falls within this statutory definition, including:

> (1) the extent to which the information is known outside of the business;
>
> (2) the extent to which it is known by employees and others involved in the business;
>
> (3) the extent of measures taken by the business to guard the secrecy of the information;
>
> (4) the value of the information to the business and to its competitors;
>
> (5) the amount of money or effort expended by the business in developing the information;
>
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001) (citation omitted), *cited in PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 973, (6th Cir. 2007).

The defendants argue that the TUTSA claim must be dismissed because it depends entirely on allegations that defendant Bremer remembered confidential information acquired while he was employed by Align and that a person's "remembered information" or "information learned as the result of relationships" is not protectible as trade secrets under Tennessee law. (Doc. No. 23, at 8 (citing *PartyLite Gifts*, 246 F. App'x at 973; *B&L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 215 (Tenn. Ct. App. 2004)).)

In *PartyLite*, the Sixth Circuit referenced the district court's opinion as stating that a former employee's "personal knowledge of individual sales consultants and relationships she developed while at PartyLite . . . was likely not a trade secret as under Tennessee law an employee's 'remembered information' and relationships with customers are not trade secrets." 246 F. App'x at 973. That, however, was not the basis of the Sixth Circuit's ruling. Instead, the court's actual conclusion was that,

> [g]iven the apparent widespread distribution of the PartyLite magazine [listing the names of sales consultants] and lack of any confidentiality protections noted on it, combined with the relative ease in locating sales consultants via web searches, we cannot say the district court abused its discretion in concluding the names are not a trade secret.

*Id.* at 974. The court referenced evidence in the record that the former employee's knowledge of the identify of sales consultants was based on her own "personal experience" rather than "misappropriation of PartyLite's records before her departure," but the critical factor was the extent to which the information was publicly available.

The Tennessee case cited for the proposition that "remembered information" is never protectible as a trade secret, *B&L*, also does not stand for that principle. There, the Tennessee Court of Appeals simply reiterated its prior holding that, "[i]n the absence of evidence to the contrary, . . . [r]emembered information as to a business's prices" is not considered confidential.

162 S.W.3d at 215 (quoting *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602 (Tenn. Ct. App. 1998)). More recently, in *Hinson v. O'Rourke*, No. M2014-00361-COA-R3-CV, 2015 WL 5033908, at *2 (Tenn. Ct. App. Aug. 25, 2015), the trial court had dismissed a plaintiff's trade secret claims but denied the defendant's motion for attorney's fees under the TUTSA. Both parties appealed. The defendant argued that the plaintiff's claim was brought in bad faith, because it was clear under Tennessee law that "remembered information" was not a trade secret. Although the court articulated the defendant's argument several times, *see id.* at *2, *5, *6, that was not the basis for the trial court's or the appellate court's dismissal of the plaintiff's claims. Instead, "[t]he trial court found that the information provided to Defendant did not include 'trade secrets' as defined by the Act because the information is readily ascertainable since it is demonstrated in front of a public audience, and the information is general knowledge known within the industry." *Id.* at *5. The appellate court affirmed. *Id.*[2]

In short, the court rejects the defendant's argument that "remembered information," *per se,* is never protectible as a trade secret. As the plaintiffs assert, if someone with a photographic memory has access to Coca-Cola's formula and improperly uses his recollection of the formula, that would not necessarily make the formula less a trade secret. The fact that Bremer may have remembered information that happens to qualify as a trade secret would not make the information less secret. Moreover, even if remembered information could not be protectible as

---

[2] Unfortunately, several Tennessee district court opinions have repeated the "remembered information" portion of *PartyLite* that simply reiterates the district court's finding without actually adopting it. *See, e.g.*, *Miller v. Crescent Homes Tenn., LLC*, No. 3:18-CV-00267, 2018 WL 4701594, at *3 (M.D. Tenn. Oct. 1, 2018) (Campbell, J.) (granting motion to dismiss, finding that the plaintiff's personal "expertise" was not a trade secret); *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 961 (M.D. Tenn. 2011) (Sharp, J.) (denying motion to dismiss); *PGT Trucking, Inc. v. Jones*, No. 15-1032, 2015 WL 4094265, at *3 (W.D. Tenn. July 7, 2015) (Breen, C.J.) (denying motion to dismiss). None of holdings of these cases dismissed claims on that basis, however.

trade secrets, the plaintiffs and the court have no way to ascertain at this juncture what Bremer actually remembered and to what extent he might have relied on documentation. *Accord ProductiveMD, LLC v. 4UMD*, LLC, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011) (denying motion to dismiss in part because "the Court has no way of determining from the pleadings what Becker did or did not remember when he went to work for 4UMD").

The defendants also argue that the information at issue is not protectible because Bremer did not access the information improperly, breach a duty of confidentiality, or do anything except use appropriately acquired skill and expertise. They argue that the plaintiffs are essentially attempting to impose upon him a *de facto* non-compete, even though he never executed such an agreement, and certainly not one in favor of the plaintiffs.

The plaintiffs did enter into the Operating Agreements, which incorporated confidentiality provisions, with Align Technology, Inc. ("Align"), at a time when Align employed Bremer as its Global Process Owner (Plan-to-Make). (Doc. No. 1 ¶ 4.) In that capacity, Bremer worked closely with SDC, attending weekly calls with SDC employees, meeting with the SDC team, participating in the design and testing of the technical specifications required for Align's manufacturing of SDC's aligners, and assisting in the integration of SDC's software with Align's programs. (*Id.*) The plaintiffs allege that Bremer "built Align's manufacturing system for SDC pursuant to" the partnership between Align and SDC. (Doc. No. 1 ¶ 6.) It is allegedly "through these interactions [that] Bremer gained access to SDC's trade secrets and confidential information." (Doc. No. 1 ¶ 5.) More specifically, he "learned SDC's process—from the moment a consumer makes an appointment at a SMILESHOP retail store, through submission of an order, to the delivery of the aligners." (Doc. No. 1 ¶ 29.) The plaintiffs further state that Bremer subsequently left Align, moved to Nashville, and opened a directly

competing business, using SDC's trade secrets and confidential information to do so. (Doc. No. 1 ¶ 6.)

More particularly, the plaintiffs allege that SDC's management and owners "have a long history of being successful pioneers in direct-to-consumer ventures" and that SDC relied on that expertise and spent a substantial amount of money developing its direct-to-consumer marketing strategy. (Doc. No. 1 ¶ 23.) They allege that the trade secrets at issue include "business plans, marketing and promotional strategies, consumer and market information, performance information around SMILESHOP show rates and conversion, operation and workflow at SMILESHOP retail stores, stores, pricing information, financing options and strategies, and competitive business information." (*Id.*) They also claim that "what has and has not worked for SDC" and how it "plans, markets, and operates each location" are trade secrets. (Doc. No. 1 ¶ 69.) The plaintiffs allege that SDC's confidential information and trade secrets are not generally known to the public, that it derives an economic benefit because this information is not generally known to the public, and that it took reasonable efforts to maintain the secrecy of its confidential information and trade secrets. (Doc. No. 1 ¶ 24.) Under the heading "Count V," the plaintiffs further assert that Bremer "acquired SDC's confidential information and trade secrets while employed at Align, and knew or should have known that he had a duty to keep all of SDC's trade secrets and confidential information secret," that he "may have acquired SDC's trade secrets and confidential information through Align itself," and that he "misappropriated" the trade secrets when he used them to open a competing business. (Doc. No. 1 ¶¶ 70, 71.)

At this juncture it is unclear as a factual matter what exactly Bremer's role with Align was, and also unclear as a legal matter to what extent Align's agreements with the plaintiff might have given rise to obligations on the part of Bremer to also maintain the confidentiality of the

information shared by SDC under the agreements with Align. The parties have not actually briefed this issue, and it appears to be a matter to be developed during discovery.

Moreover, as set forth above, the statute defines "misappropriation" very broadly as including the

> [d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [, a]t the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or . . . [d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

Tenn. Code Ann. § 47-25-1702(b). For purposes of the defendants' Motion to Dismiss, the Complaint adequately alleges that Bremer acquired trade secret information under circumstances giving rise to a duty to maintain its secrecy or limits its use or that he technically acquired it through Align, as his employer, which had such a duty. The plaintiffs also adequately allege that the information acquired by Bremer was not general "expertise" but, instead, information that qualifies as trade secrets.

The court finds that the plaintiff plausibly states a claim for misappropriation of trade secrets under the TUTSA and will deny the motion to dismiss this claim.

### 4.     Count VI

The defendants' motion does not contain any argument directed specifically toward Count VI, which is a claim for trade secret misappropriation under the Federal Defend Trade Secrets Act. The motion to dismiss Count VI will be denied for the same reasons discussed in connection with Count V.

### 5.     Preemption: Counts VII, VIII, IX, and X

The defendants argue that Counts VII and VIII (procurement of breach of contract), Count IX (intentional interference with existing or prospective business relationships), and Count

X (unjust enrichment) are all preempted by the TUTSA.

The TUTSA expressly provides that it "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Tenn. Code Ann. § 47-25-1708(a). Contractual remedies and "[o]ther civil remedies that are not based upon misappropriation of a trade secret" are not preempted. *Id.* § 47-25-1708(b).

The statute provides little guidance regarding how it should be interpreted or applied, and the Tennessee courts have not been directly called upon to elaborate upon it. The Eastern District of Tennessee, however, after considering the question exhaustively, adopted the "same proof" standard for determining whether another claim, asserted in conjunction with a trade secret claim, is preempted by the TUTSA. Under this standard,

> a claim will be preempted when it necessarily rises or falls based on whether the defendant is found to have "misappropriated" a "trade secret" as those two terms are defined in the UTSA. Stated another way, if proof of a non-UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective of whatever surplus elements or proof were necessary to establish it. . . . If a proven claim, whether in whole or in part, constitutes misappropriation of trade secret, it is that and that alone.

*Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 658 (E.D. Tenn. 2004). This court finds this standard to be consistent with both the language and purpose of the UTSA generally and Tenn. Code Ann. § 47-25-1708 specifically. *Id.*; *accord Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp. 3d 830, 845 (M.D. Tenn. 2019) ("The Tennessee Supreme Court has not yet interpreted the scope of the TUTSA's displacement, but other state and federal courts have applied the 'same proof' standard, under which 'a claim will be preempted when it necessarily rises or falls based on whether the defendant is found to have "misappropriated" a "trade secret" as those two terms are defined in the [T]UTSA.'" (quoting *PGT Trucking, Inc. v. Jones*, No. 15-1032, 2015 WL 4094265, at *4 (W.D. Tenn. July 7, 2015) (collecting cases))).

Under this standard, the plaintiffs' non-TUTSA claims will be preempted if, as pleaded, they will succeed or fail depending on proof that the defendants disclosed or used the plaintiffs' trade secrets, as defined in Tenn. Code Ann. § 47-25-1702(4), while knowing that their knowledge of the trade secrets was either "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" or was "derived from or through a person who owed a duty to [the plaintiffs] to maintain its secrecy or limit its use." Tenn. Code Ann. § 47-25-1702(2)(B)(ii).

### a)  Inducement of Breach of Contract

Counts VII and VIII claim that the defendants induced Align to breach the Operating Agreements and Supply Agreement, in violation of Tenn. Code Ann. § 47-50-109 and common law. To state a claim for inducement of breach of contract under either, a plaintiff must allege that (1) there was a legal contract; (2) the defendant was aware of the contract; (3) the defendant maliciously intended to induce a breach; and (4) the defendant's actions proximately caused a breach and resulting damages. *Hauck Mfg. Co.*, 375 F. Supp. 2d at 659 (citing *Quality Auto Parts Co., Inc. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994); *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999)).

In support of Counts VII and VIII, the plaintiffs allege the existence of valid agreements between SDC and Align; that the defendants knew about the agreements; that Align actually breached the agreements; and that the defendants intentionally induced Align to breach the agreements, to the plaintiffs' detriment.

The defendants assert that the gravamen of the inducement claims is the alleged misappropriation of trade secrets, because the defendants allegedly were only able to operate the competing SmileStore as a result of having misappropriated trade secrets. The court disagrees. The plaintiffs allege that the restrictive covenants in the Operating Agreements prohibit Align

from contracting with any "Competing Business," as that term is defined by the Operating Agreements. (Doc. No. 1 ¶ 27.) In the Supply Agreement, Align agreed not to provide aligners to any other company distributing aligners through a direct-to-consumer model. (*Id.*) The plaintiffs allege that Bremer knew about these agreements, launched a competing business, and induced Align to contract with him. Regardless of whether Bremer had the right to open a competing business or improperly used trade secrets in doing so, the procurement claims do not overlap with the trade secret misappropriation claims. Specifically, neither inducement claim requires proof of the existence of a trade secret or misappropriation, and proof of the elements of these claims will not simultaneously establish a claim for misappropriation of trade secrets. *See Hauck*, 375 F. Supp. 2d at 658. Instead, proof of these claims will require establishing, among other things, that Align breached the agreements, which will require proof that the SmileStore is actually a Competing Business or employs a direct-to-consumer model, as those terms are defined by the operative agreements. The inducement of breach of contract claims are not preempted by the TUTSA, and the motion to dismiss the claims on that basis will be denied.

   *b) Intentional Interference with Existing or Prospective Business Relationships*

   To sustain a claim for intentional interference with business relationships under Tennessee law, a plaintiff must prove the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's *improper motive* or *improper means* . . . and finally, (5) damages resulting from the tortious interference."

*Beijing Fito Med. Co., Ltd. v. Wright Med. Tech., Inc.*, 763 F. App'x 388, 397–98 (6th Cir. 2019) (quoting *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)).

The defendants argue that the intentional interference claim is preempted by the TUTSA, again because the "gravamen" of the claim "is that Defendant Bremer misappropriated Plaintiffs' trade secrets, thus allowing Defendants to interfere with Plaintiffs' contractual relationships with Align when Align improperly supplied aligners to Defendants." (Doc. No. 23, at 9.) That is, the claims "rest . . . on the appropriation of confidential information that would be considered a 'trade secret' under the TUTSA." (*Id.* at 10 (quoting *Wachter, Inc.*, 2019 WL 2011048, at *12.) In their Response to the defendants' Motion to Dismiss, the plaintiffs' support for this claim is identical to that offered in support of the inducement of breach of contract claims—they do not distinguish between them. That is, they insist that the tortious interference claim is based on allegations that the defendants interfered with the restrictive covenants and exclusivity provisions in the Operating Agreements and Supply Agreement between the plaintiffs and Align.

In their Reply, the defendants argue that the plaintiffs "attempt to recast their allegations" to avoid preemption under the TUTSA. (Doc. No. 27, at 5.) They maintain that, if the problem were really that Align was working with the defendants, then the defendants would have sent a cease-and-desist letter to *Align*, rather than to the defendants. They also assert that the plaintiffs' claims rest on the premise that the defendants' business would not even exist, but for their having misappropriated the plaintiffs' trade secrets.

The question is whether proof of this claim would also require proving misappropriation of trade secrets. As with the procurement of breach of contract claims, the plaintiffs do not allege that the defendants used confidential information to induce Align to do business with it. In fact, it appears that Align may have been in possession of all or most of the same information as Bremer. The defendants argue that the plaintiffs' claims are premised upon their assertion that the defendants were only in a position to do business at all because of their misappropriation of

trade secrets and, as a result, that they would not have been in a position to induce anyone to do business with them, but for the alleged misappropriation.

The court is not persuaded by this logic. The tortious interference claims, like the inducement of breach of contract claims, are based on conduct that is at least one step removed from the alleged misappropriation of trade secrets. Regardless of whether the plaintiffs are able to prove the existence of trade secrets or misappropriation, they allege that the defendants wrongfully interfered with its business relations with Align by inducing Align to do business with them at all, not by, as in *Wachter*, offering the plaintiffs' confidential information to Align in order to induce the relationship.

This claim is not preempted by the trade secret misappropriation claims.

### c) Count X

The tenth cause of action is for unjust enrichment. In Tennessee, unjust enrichment is a quasi-contractual theory pursuant to which a court may impose a contractual obligation where one does not exist. *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (citing *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154–55 (Tenn. 1966)). "A contractual obligation under an unjust enrichment theory will be imposed when: (1) no contract exists between the parties or, if one exist[s], it has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation." *B & L Corp.*, 162 S.W.3d at 217.

In support of this claim, the plaintiffs allege as follows:

> 108. While working with SDC during his tenure at Align, Bremer received the benefit of learning the inner workings of SDC's business—including its workflows—through observation and regular communication with SDC employees.

109. Bremer knew the value of this information. Bremer, in fact, sought out opportunities to learn more about SDC's business, even when these opportunities had no relationship to his responsibilities at Align.

110. Defendants accepted the benefit of this information by using it as a blueprint to create SmileStore and operate SmileStore's website and the SMILESTORE retail store.

111. SDC has spent a considerable amount of time, energy, and money to create the SMILESHOP retail stores and the workflow for the SMILESHOP stores, and it is inequitable for Bremer to retain the benefit of this information without compensating SDC.

112. The Court should award SDC damages based on Bremer and SmileStore's unjust enrichment using SDC's information.

(Doc. No. 1 ¶¶ 108–12.) In other words, it is clear from the face of the Complaint that the unjust enrichment claim is premised upon the defendants' possession and use or misuse of the same information that is the subject of the plaintiffs' trade secret misappropriation claims.

The defendants argue that the claim is preempted on that basis. They also argue that the plaintiffs did not "willingly" confer a benefit upon the defendants. The plaintiffs, in response, argue that (1) the TUTSA does not preempt contractual remedies, which should extend to a "contract implied at law"; (2) even if the TUTSA preempts their unjust enrichment claim, they "may still plead unjust enrichment in the alternative" (Doc. No. 24, at 15 (citing Fed R. Civ. P. 8(d)(3); *Broadnax v. Swift Transp. Co.*, 694 F. Supp. 2d 947, 952 (W.D. Tenn. 2010))); and (3) the plaintiffs "willingly" provided the benefit—the information—to Bremer while he was employed by Align, in reliance on the Operating Agreements with Align.

The court rejects the plaintiffs' first argument as a matter of law. Although unjust enrichment is described as a quasi-contractual remedy, it comes into play only where there is no contract at all, or the contract has become unenforceable or invalid. As such, it does not fall within the TUTSA's exemption of "contractual remedies" from the scope of preempted causes of action. Tenn. Code Ann. § 47-25-1708(b)(1). Many courts have held that unjust enrichment

claims may be preempted by the TUTSA's preemption provision, Tenn. Code Ann. § 47-25-1708(a), depending upon the facts of the particular case. *See, e.g.*, *Wachter*, 387 F. Supp. 3d at 848 ("Further, insofar as this [unjust enrichment] claim relies on the conversion of confidential information, it is preempted by TUTSA."); *Hauck Mfg.*, 375 F. Supp. 2d at 662 ("[T]he UTSA creates one class of protected confidential intangible property and provides the exclusive cause of action for theft or misuse thereof. Accordingly, Plaintiff's unjust enrichment claim is preempted.").

The court also rejects the plaintiffs' contention that this claim may be pleaded in the alternative. The case cited by the plaintiffs does not involve trade secrets and held only that a plaintiff may plead both breach of contract and unjust enrichment. *Broadnax*, 694 F. Supp. 2d at 952. The court in *Hauck* considered this precise argument and noted that some courts, indeed, had allowed plaintiffs to "maintain alternative theories at least until it can be determined whether the information in question constitutes a trade secret," while others had "rejected this approach as inconsistent with the purpose of the UTSA." *Hauck*, 375 F. Supp. 2d at 657. The district court in *Hauck*, itself, having conducted an exhaustive analysis of the issue and the conflicting and confusing proliferation of interpretations of the preemption provision, rejected the plaintiff's argument that "certain of its non-UTSA claims . . . are not preempted because they do not depend on the information at issue qualifying as a 'trade secret." *Id.* at 656. The court stated:

> [A] a plaintiff surely cannot use general tort causes of action to revive claims which would otherwise not be cognizable in light of the UTSA (i.e., claims alleging theft of non-trade secret information). It is a legal *non sequitur* to suggest general tort causes may be employed to protect legal rights which otherwise do not exist. . . . Moreover, such an approach would be wholly inconsistent with the UTSA's goals of promoting uniformity and predictability. . . . A claim cannot be preempted or not preempted based entirely upon whether or not the information at issue qualifies as a trade secret. If the information is a trade secret, the plaintiff's claim is preempted; if not, the plaintiff has no legal interest upon which to base his or her claim. Either way, the claim is not cognizable.

*Id.* at 656–57; *accord Wachter*, 387 F. Supp. 3d at 846 n.10 (citing *Hauck*); *Goldthread v. Davison*, No. 3:06-0805, 2007 WL 2471803, at *7 (M.D. Tenn. Aug. 29, 2007) (Echols, J.) ("Consequently, the above analysis—indicating that plaintiff fails to state a claim upon which relief can be granted under TUTSA because his composition of matter concept fails to qualify as a 'trade secret' within the meaning of the law—directs the conclusion that these common law causes of action [including unjust enrichment claim] should also be dismissed.").

The court agrees and finds that this claim is subject to dismissal as preempted by the TUTSA.

**B.      Failure to Name an Indispensable Party**

1.      Rule 12(b)(7)—Standard of Review

Rule 12(b)(7) authorizes a defendant to move to dismiss a complaint for failure to join a party under Rule 19 of the Federal Rules of Civil Procedure. Dismissal under Rule 12(b)(7) is appropriate "when there is an absent person without whom complete relief cannot be granted." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1359 (3d ed. 2004). The court must determine the indispensability of absent parties before ruling on the merits of a case. *Keweenaw Bay Indian Cmty. v. Michigan*, 11 F.3d 1341, 1348 (6th Cir. 1993) (citing *Tankersley v. Albright*, 514 F.2d 956, 966 (7th Cir. 1975)).

In a motion to dismiss under Rule 12(b)(7), just as is the case under Rule 12(b)(6), the court accepts the plaintiff's allegations as true and draws all reasonable inferences in his favor. *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 465 (D.C. Cir. 2017) (citing *Paiute-Shoshone Indians of the Bishop Cmty. v. City of Los Angeles*, 637 F.3d 993, 996 n.1 (9th Cir. 2011)).

The analysis under Rule 19 involves two steps: (1) the court must determine whether the absent parties are required parties; and if so, (2) the court must determine whether, in their

absence, equity and good conscience require that the case be dismissed. *Sch. Dist. v. Sec'y of U.S. Dept. of Educ.*, 584 F.3d 253, 264–65 (6th Cir. 2009). "If the answer to either question is no, then Rule 19 does not" require dismissal. *Id.* at 265.

The first step of the inquiry is set out in Rule 19(a), which provides that an absent party is required for joinder if

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or

> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

>> (i) as a practical matter impair or impede the person's ability to protect the interest; or

>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). If the court finds that an absent party is required but that joinder is not feasible, then the court proceeds to the second step, which is governed by Rule 19(b). *Sch. Dist.*, 584 F.3d at 264. Under that paragraph, the court "must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In doing so, the court should consider the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

> (2) the extent to which any prejudice could be lessened or avoided by:

>> (A) protective provisions in the judgment;

>> (B) shaping the relief; or

>> (C) other measures;

> (3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). Ultimately, "the burden is on the moving party 'to show the nature of the unprotected interests of the absent individuals [or organizations] and the possibility of injury to them or that the parties before the court will be disadvantaged by their absence.'" *United States v. Sweeny*, 418 F. Supp. 2d 492, 499 (S.D.N.Y. 2006) (quoting Wright & Miller, *supra*, § 1359).

The Supreme Court has stated that "the issue of joinder [under Rule 19] can be complex, and determinations are case specific." *Republic of Phil. v. Pimentel*, 553 U.S. 851, 863 (2008) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118–19 (1968)). Thus, Rule 19 "is not to be applied in a rigid manner but should instead be governed by the practicalities of the individual case." *Smith v. United B'hood of Carpenters & Joiners*, 685 F.2d 164, 166 (6th Cir. 1982) (citing *Patterson*, 390 U.S. at 116 n.12). "Rule 19 calls for a pragmatic approach; simply because some forms of relief might not be available due to the absence of certain parties, the entire suit should not be dismissed if meaningful relief can still be accorded." *Keweenaw Bay Indian Cmty.*, 11 F.3d at 1346 (citation omitted).

2. Discussion

With no analysis of the above-referenced principles, and without any discussion as to how they relate to each of the individual counts in the Complaint, the defendants argue that Align is an indispensable party whose absence will impede or impair Align's ability to protect its interests with respect to all of the plaintiffs' "non-trademark claims." (Doc. No. 23, at 15.)

The court will deny, without further discussion, the defendants' motion, insofar as the defendants intend to argue that Align is an indispensable party with respect to any claims other than those for inducement of breach of contract. None of the other "non-trademark claims"

requires proof that Align breached any agreements, and the defendants do not provide any other basis for their argument that Align is an indispensable party.

In support of their contention that Align is an indispensable party with respect to the claims of inducement of breach of contract, the defendants assert that, "[t]hroughout their Complaint, the plaintiffs allege that the Operating Agreements and Supply Agreement severely restrict the entities and customers to which Align can sell aligners." (*Id.*) As a result, they claim that Align has interests relating to the subject of the action and that its absence will impede and impair Align's ability to protect its interests, because a ruling that Align has breached the agreements would effectively gut Align's ability to sell its product and "stifle" the plaintiffs' "most significant competition." (*Id.* at 16.)

The plaintiffs respond that Align is not a required party under Rule 19(a), because its interests are adequately represented by the defendants and that, even if it were "required," joinder is not feasible, because Align's obligations under the applicable agreements are subject to arbitration and the plaintiffs cannot compel the named defendants to arbitrate.[3] They contend that a judgment rendered in Align's absence would be adequate but that the plaintiffs would not have an adequate remedy at all if the action were dismissed for nonjoinder. In their Reply, the defendants quibble with the plaintiffs' failure to include as exhibits complete copies of their agreements with Align (which plaintiffs subsequently filed with their Sur-reply), maintain that they cannot assert defenses available to Align under the agreements because they themselves are

---

[3] The plaintiffs also attached to their Response a copy of the April 29, 2019 Order of the Circuit Court of Cook County, Illinois, granting the plaintiffs' motion to confirm an arbitration award entered against Align, and a redacted copy of the March 4, 2019 arbitration award itself. The arbitration award enjoins Align and all those acting in concert with Align from, among other things, conducting business at Invasalign stores, opening new Invisalign stores, providing certain enumerated services in physical retail establishments, and using SDC's confidential information. (Doc. No. 24-1.)

not parties thereto, and argue that the plaintiffs have an adequate remedy because they could simply pursue another arbitration against Align for breach of the agreements.

The court finds that Align is not a required party, because disposing of the action in Align's absence will not, as a practical matter, impair Align's ability to protect its interests. The defendants' defense to the inducement claims are grounded, in large part, in a factual dispute concerning the type and scope of the defendants' business, issues the defendants themselves are in the best position to litigate. That is, the plaintiffs allege that their agreements with Align prohibit Align from selling aligners to businesses that distribute aligners through a direct-to-consumer model or to a Competing Business, defined by the Operating Agreements to include businesses that provide "services identical or substantially similar to the service provided by" the plaintiffs. (Doc. No. 1, ¶¶ 25, 27) The plaintiffs also allege that the defendants operate a "Competing Businesss" and that they operate on a direct-to-consumer model, as that term is defined by the Supply Agreement. The defendants, for their part, insist that they "do *not* operate on a [direct-to-consumer] model" or "operate in a substantially similar way to Plaintiffs," but instead "operate a traditional on-site, in-person orthodontist practice." (Doc. No. 23, at 10–11, 15.)

In other words, the defendants deny as a factual matter that Align's dealings with them constitute breach of the agreements between Align and the plaintiffs. Assuming that the plaintiffs can prove the other required elements of their inducement claims (including that the defendants were aware of the contract and maliciously intended a breach thereof), the plaintiffs will also have to prove actual breach of the contract, that is, that the defendants' business is among those with which Align is contractually prohibited from dealing. The defendants are equally as motivated as Align to litigate this issue, and Align's interest in the issue is identical to that of the

defendants. As a result, Align's interests are adequately represented by the defendants, and Align is not a necessary party for purposes of Rule 19(a)(1)(B)(i). *Accord Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 266 (6th Cir. 2009); *Am. Express Travel Related Servs., Co. v. Bank One-Dearborn, N.A.*, 195 F. App'x 458, 461 (6th Cir. 2006) (finding absent party not "required" for purposes of Rule 19(a)(1)(B)(i), where it was clear that "the interests of a present party to the suit are such that it will undoubtedly make all" of the absent party's arguments, the present party was "capable of and willing to make such arguments," and there was no showing that the absent party would "offer any necessary element to the proceedings" that the present parties would neglect (quoting *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992)); *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 304 F.R.D. 520, 533 (W.D. Tenn. 2015) ("If an absent party is adequately represented, then there is no practical prejudice to the absent party.).

Because the court finds that Align is not a required party, the court does not reach the question of whether joinder is not feasible.

## III. CONCLUSION

For the reasons forth herein, the court will grant in part and deny in part the defendants' Motion to Dismiss. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge